GARLAND, Circuit Judge,
dissenting:
The plaintiffs in these cases allege that they were beaten, electrocuted, raped, subjected to attacks by dogs, and otherwise abused by private contractors working as interpreters and interrogators at Abu Ghraib prison. At the current stage of the litigation, we must accept these allegations as true. The plaintiffs do not contend that the United States military authorized or instructed the contractors to engage in such acts. No Executive Branch official has defended this conduct or suggested that it was employed to further any military purpose. To the contrary, both the current and previous Administrations have repeatedly and vociferously condemned the conduct at Abu Ghraib as contrary to the values and interests of the United States. So, too, has the Congress.
No act of Congress and no judicial precedent bars the plaintiffs from suing the private contractors — who were neither soldiers nor civilian government employees. Indeed, the only statute to which the defendants point expressly excludes private contractors from the immunity it preserves for the government. Neither President Obama nor President Bush nor any other Executive Branch official has suggested that subjecting the contractors to tort liability for the conduct at issue here would interfere with the nation’s foreign policy or the Executive’s ability to wage war. To the contrary, the Department of Defense has repeatedly stated that employees of private contractors accompanying. the Armed Forces in the field are not within the military’s chain of command, and that such contractors are subject to civil liability.
Under the circumstances of these cases, there is no warrant for displacing the ordinary operation of state law and dismissing the plaintiffs’ complaints solely on preemption grounds. Accordingly, I would affirm the district court’s denial of summary judgment as to CACI and reverse its grant of summary judgment in favor of Titan.
I
Following the 2003 invasion of Iraq, the United States took over Abu Ghraib prison and used it as a detention facility. According to official Department of Defense (DOD) reports, “numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees” at Abu Ghraib between October and December 2003. Maj. Gen. Antonio M. Taguba, Article 15-6 Investigation Of The 800th Military Police Brigade 16 (2004). Those reports noted the participation of contractor personnel in the abuses and specifically identified Titan and CACI employees as being among the perpetrators. Id. at 48; Maj. Gen. George R. Fay, Ar 15-6 Investigation Of The Abu Ghraib Detention Facility And 205th Military Intelligence Brigade 72-73, 79, 81-82, 84, 86, 87, 89, 130-34 (2004) [hereinafter Report Of Maj. Gen. Fay].
Responding to the release of graphic photographs of the conduct at Abu Ghraib, President George W. Bush declared that “the practices that took place in that prison are abhorrent and they don’t represent America.” White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004). Concerned that those “who want to dislike America will use this as an excuse to remind people about their dislike,” he assured “[t]he people of the Middle East *18 ... that we will investigate fully, that we will find out the truth ... and [that] justice will be served.” Id. Secretary of Defense Donald Rumsfeld, testifying before Congress, similarly condemned the abuses as “inconsistent with the values of our nation.” Donald H. Rumsfeld, Testimony Before the Senate and House Armed Services Committees 1 (May 7, 2004).[1] He, too, stressed the damage “[t]o the reputation of our country,” but said that “this is also an occasion to demonstrate to the world the difference between those who believe in democracy and human rights and those who believe in rule by the terrorist code.... Part of [our] mission — part of what we believe in — is making sure that when wrongdoing or scandal occur, that they are not covered up, but exposed, investigated, publicly disclosed — and the guilty brought to justice.” Id. at 1, 6. Congress expressed the same sentiments.[2]
The seventeen named plaintiffs in the cases now before us contend that they (or their deceased husbands) were among the detainees who were subjected to the abuses that the President and Secretary of Defense decried. According to their complaints, they are Iraqi nationals (or their widows) who were detained at Abu Ghraib and eventually released without charge. The defendants are two private American companies, CACI and Titan. Pursuant to government contracts, CACI provided interrogators and Titan provided interpreters who worked at Abu Ghraib.
The plaintiffs contend that CACI and Titan employees subjected them to the following acts, among many others:'
“[T]ortur[ing] [Plaintiff Ibrahim’s husband] by repeatedly inflicting] blows and other injuries to his head and body[,] ... thereby causing extreme physical and mental pain and suffering and, ultimately, his death.” Second Am. Compl. ¶ 33, Ibrahim v. Titan Corp. [hereinafter Ibrahim Compl.]. “[T]ortur[ing] [Plaintiff] Aboud ... [b]y beating him with fists and sticks; ... urinating on him; ... [and] threatening to attack him with dogs.” Id. ¶ 38. “[T]ortur[ing] [Plaintiff] Hadod ... [b]y beating him with fists and striking his head against a wall; [and] forcing him to watch his elderly father being hung up and then beaten.” Id. ¶ 42.
“[T]ortur[ing] [Plaintiff Al Jumali’s husband] by beating him, gouging out one of his eyes, electrocuting him, breaking one of his legs, and spearing him, ... thereby causing ... his death.” Id. ¶ 51.
“Roping Plaintiff Saleh and 12 other naked prisoners together by their genitals and then pushing one of the male detainees to the ground, causing the others to suffer extreme physical, mental and emotional distress; .... [r]epeatedly shocking Plaintiff Saleh with an electric stick and beating him with a cable; ... [and][t]ying his hands above his head and sodomizing him____” Third Am. Compl. ¶ 116, Saleh v. Titan Corp. [hereinafter Saleh Compl.].
“Stripping [Plaintiff Al-Nidawi], tying his hands behind his back and releasing dogs to attack his private parts.” Id. ¶ 142.
*19 “[F]orc[ing] Plaintiff Haj Ali to stand on a box, with electrical wires attached to his wrists and [shocking] him with intense pulses of electricity....” Id. ¶ 125.
Plaintiffs sued defendants for (inter alia) the common law torts of assault, battery, and intentional infliction of emotional distress. In their complaints, they name specific CACI and Titan employees alleged to have brutalized them. Ibrahim Compl. ¶¶ 37, 55; Saleh Compl. ¶¶ 17-19, 24-27, 49-50.
Although today’s opinion states that the plaintiffs complain only of “abuse” and not “torture,” Op. at 3, the complaints repeatedly describe the conduct to which they were subjected as “torture.” See, e.g., Ibrahim Compl. ¶ 1 (“Specifically, the Plaintiffs allege that they or their decedents ... were unlawfully tortured by agents or employees of the Defendants .... ”); Saleh Compl. ¶ 1 (“alleging] that Defendants tortured and otherwise mistreated Plaintiffs”). The district court certainly understood that to be what the plaintiffs allege. Ibrahim v. Titan Corp., 391 F.Supp.2d 10, 12 (D.D.C.2005) (Plaintiffs “assert that defendants and/or their agents tortured one or more of them.”). And that is what the plaintiffs continue to allege in their briefs on appeal, which accuse both CACI and Titan employees of torturing them. See, e.g., Plaintiffs-Appellees’ Br. 17 (regarding CACI); Plaintiffs-Appellants’ Reply Br. 11, 13, 16 (regarding Titan). In any event, the quotations set out in the previous paragraph describe some of the most egregious of the conduct at issue, and there is no dispute that if tort law applies, plaintiffs have stated a cause of action.
The court’s opinion also appears to take issue with the merits of some of the plaintiffs’ allegations, suggesting that government determinations cast doubt upon whether the plaintiffs were actually subjected to this conduct by the defendants. That is not correct.[3] More important, it is irrelevant. To date, there has been no discovery or summary judgment on the merits of the plaintiffs’ allegations — the district court limited these to the issue of preemption. See 391 F.Supp.2d at 18-19. Accordingly, and as the court acknowledges, at this stage of the litigation we must take the allegations of the complaints to be true. Op. at 2-3; see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). In light of the DOD reports about what hap *20 pened at Abu Ghraib, we can hardly regard those allegations as implausible.
Moreover — and more important still— today’s decision preempts all such litigation, regardless of its merit. Indeed, the decision would preempt any lawsuit, even if the plaintiff had photographs that unambiguously showed private contractors in the act of abusing them. Given the findings of DOD and the declarations of President Bush and Secretary Rumsfeld, there may be at least some prisoners who have equivalent evidence. Nonetheless, far from simply “takfing] the plaintiffs’ cases as they present them to us,” Op. at 3, my colleagues effectively dispose of any cases that any plaintiffs could possibly present.
Finally, it should also be emphasized that neither the Ibrahim nor the Saleh complaints allege that the defendants’ actions were ordered or authorized by the United States government. Nor has any party proffered any evidence that the United States did order or authorize such conduct, or that it was undertaken to obtain information or to further any other military purpose.[4] To the contrary, the plaintiffs contend that the contractors “acted unlawfully and without military authorization.” Plaintiffs-Appellees’ Br. 46 (emphasis added).[5] The Saleh (but not the Ibrahim) complaint does charge that the private contractors acted together with a small number of low-ranking soldiers — soldiers who were later court-martialed for their unauthorized, illegal conduct. Saleh Compl. ¶ 28; Plaintiffs-Appellees’ Br. 17-18, 24.[6] But there is no allegation, and no evidence, that those soldiers had any control, de jure or de facto, over the defendants. Hence, it is incorrect to say that “these cases are really indirect challenges to the actions of the U.S. military.” Op. at 7. Rather, they are direct challenges to the unlawful and unauthorized actions of private contractors.
II
The court directs the dismissal of the plaintiffs’ common law tort claims on the ground that they are preempted by federal law. But what federal law does the preempting?
The defendants (and the court) cite only one law: the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80. But if we follow our usual rule — to learn the meaning of a statute by reading its text — preemption under that Act is inappropriate. See Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (“We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.”). The text of the FTCA does in *21 deed evidence congressional concern with common law tort claims, but that concern is directed solely at claims leveled “against the United States” for the wrongful acts of “any employee of the Government.” Id. § 1346(b)(1). The Act permits plaintiffs to sue the United States in federal court for state-law torts committed by government employees within the scope of their employment, but contains specific exceptions that preserve the government’s sovereign immunity under certain circumstances. Id. §§ 1346(b), 2671-80. Nothing in the language of the statute applies to suits brought against independent contractors, like the defendants in these cases. In fact, the reverse is true. Although the FTCA states that the term “[ejmployee of the government” includes “employees of any federal agency,” it expressly states that “the term ‘Federal agency’ ... does not include any contractor with the United States.” Id. § 2671 (emphasis added).
In Boyle v. United Technologies Corp., the Supreme Court invoked an implied, but direct conflict with the FTCA to conclude that the manufacturer of a Marine helicopter could not be held liable under state tort law for injury caused by a design defect. 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The defendants and my colleagues believe that “plaintiffs’ common law tort claims are controlled by Boyle.” Op. at 5. I agree. In this Part, I will explain why a straightforward application of Boyle yields the conclusion that preemption of the plaintiffs’ claims is unwarranted, and why we should hesitate to extend Boyle beyond the scope of the discretionary function exception and direct-conflict rationale that the Court relied upon in that case. My “quarrel” is not with Boyle — as my colleagues suppose, id. at 6 — but rather with the way in which they have extended Boyle beyond its rationale.
A
Nothing in Boyle itself warrants the preemption of state tort law in these cases. Boyle involved the co-pilot of a U.S. Marine helicopter who was killed when the helicopter crashed into the ocean. His father brought a diversity action against the contractor that built the helicopter for the United States, alleging that the design was defective because the escape hatch opened outward instead of inward — rendering it inoperable in a submerged craft. The first question the Supreme Court asked was whether the case involved “uniquely federal interests.” Boyle, 487 U.S. at 504-05, 108 S.Ct. 2510. With little difficulty, the Court concluded that “the liability of independent contractors performing work for the Federal Government ... is an area of uniquely federal interest.” Id. at 505 n. 1, 108 S.Ct. 2510. There is likewise no dispute regarding that question here.
But Boyle also declared that the fact that “the procurement of equipment by the United States is an area of uniquely federal interest does not ... end the inquiry.” Id. at 507, 108 S.Ct. 2510. “That merely establishes a necessary, not a sufficient, condition for the displacement of state law.” Id. “Displacement,” the Court declared, “will occur only where ... a significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation.” Id. (internal citations and quotation marks omitted). “The conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied.... But conflict there must be.” Id. at 507-08 (emphasis added) (internal quotation marks omitted).
The Court began with a hypothetical illustrating an instance when preemption *22 would not be warranted. “[I]t is easy to conceive,” the Court said, of a “situation[ ] in which the duty sought to be imposed on the contractor” by state law “is not identical to one assumed under the contract, but is also not contrary to any assumed”:
If, for example, the United States contracts for the purchase ... of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care.
Id. at 509, 108 S.Ct. 2510. “No one suggests that state law would generally be pre-empted in this context,” the Court said. Id. By contrast to the hypothetical am conditioner, however, the Court found a significant conflict of duties in the ease of the helicopter:
Here the state-imposed duty of care that is the asserted basis of the contractor’s liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications).
Id. (emphasis added).
The Court then invoked the FTCA’s “discretionary function” exception to delimit the circumstances in which a state-imposed duty that is “precisely contrary to” a government contract should be preempted. The Court noted that one of the circumstances that the FTCA excepted from the statute’s consent to suit was for:
[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary junction or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
Id. at 511, 108 S.Ct. 2510 (emphasis added) (quoting 28 U.S.C. § 2680(a)). “[T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision,” the Court said, and “state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a ‘significant conflict’ with federal policy and must be displaced.” Id. at 511-12, 108 S.Ct. 2510 (emphasis added). The Court then outlined “the scope of displacement” necessary to avoid such conflict as follows:
Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment.... The first two of these conditions assure ... that the design feature in question was considered by a Government officer, and not merely by the contractor itself.
Id. at 512,108 S.Ct. 2510.
The contracts at issue in the instant cases are like the one for the hypothetical air conditioner, not the helicopter. As in the contract for the air conditioner, these contracts simply required the contractors to provide particular receivables: interrogators and interpreters. The “asserted basis of the contractor’s liability” — the abuse of prisoners — is plainly not “precisely contrary to the duty imposed by the Government contract.” No party’s pleadings contend that the government required or authorized the contractor personnel at Abu Ghraib to do what state law forbids. *23 To the contrary, the plaintiffs’ contention is that the contractors “acted unlawfully and without military authorization.” Plaintiffs-Appellees’ Br. 46 (emphasis added); see supra note 5.
Boyle has never been applied to protect a contractor from liability resulting from the contractor’s violation of federal law and policy. And there is no dispute that the conduct alleged, if true, violated both.[7] Hence, these cases are not “within the area where the policy of the ‘discretionary function’ would be frustrated,” and they present no “significant conflict” with federal interests. Boyle, 487 U.S. at 512, 108 S.Ct. 2510. Preemption is therefore not justified under Boyle.
B
Recognizing that they cannot prevail under either the text of the FTCA or the holding of Boyle, the defendants ask us to expand the scope of judge-made preemption. Instead of basing preemption on the FTCA’s discretionary function exception— the only exception Boyle discussed — the defendants ask us to extend Boyle to the exception for “claimfs] arising out of the combatant activities of the military or naval forces ... during time of war.” 28 U.S.C. § 2680®. That request finds no support in either Boyle or other precedents.
At the heart of Boyle’s analysis is the doctrine of conflict preemption. See supra Part II.A. As my colleagues note, preemption under the discretionary function exception is in accord with that doctrine, as it requires “a sharp example of discrete conflict in which satisfying both state and federal duties (ie., by designing a helicopter hatch that opens both inward and outward) was impossible.” Op. at 7. By contrast, preemption under the combatant activities exception is extraordinarily broad; as employed by my colleagues, it results not in conflict preemption but in “field preemption.” Id. at 6, 7. Given that using the FTCA to preempt suits against private contractors is atextual, the Boyle Court’s decision to require discrete conflict was quite sensible.
Moreover, if we go down this road and extend Boyle to the combatant activities exception, there is no reason to stop there. The FTCA’s exceptions are not limited to discretionary functions and combatant activities. As my colleagues note, they also include “any claim arising in a foreign country.” Op. at 6 n. 3 (quoting 28 U.S.C. § 2680(k)). Hence, the “degree of integration” test that my colleagues carefully construct for combatant activities preemption, Op. at 4, seems wholly beside the point: the plaintiffs’ claims arose in Iraq, a foreign country, so why should that not be the end of the matter? Indeed, the FTCA has an additional exception that protects the government from suit for “assault [and] battery”' — whether it occurs abroad or in the United States. 28 U.S.C. § 2680(h). On the court’s theory, why should these exceptions not apply to private contractors as well? Once we depart from the limiting principle of Boyle, it is hard to tell where to draw the line.
*24 The Supreme Court has never extended Boyle beyond the discrete conflicts that application of the discretionary function exception targets. Quite the opposite, in Correctional Services Corp. v. Malesko, the Court described the Boyle defense as a “special circumstance” in which the “government has directed a contractor to do the very thing that is the subject of the claim.” 534 U.S. 61, 74 n. 6, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Wyeth v. Levine, the Supreme Court’s most recent preemption case, further reflects the Court’s unwillingness to read broad preemptive intent from congressional silence. As Wyeth explained, the Court starts with the presumption that state law is not to be superseded “unless that was the clear and manifest purpose of Congress.” — U.S.-, 129 S.Ct. 1187, 1194-95, 173 L.Ed.2d 51 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). The Court “rel[ies] on the presumption because respect for the States as ‘independent sovereigns in our federal system’ leads us to assume that ‘Congress does not cavalierly preempt state-law causes of action.’ ” Id. at 1195 n. 3 (quoting Medtronic, 518 U.S. at 485, 116 S.Ct. 2240). Thus, Wyeth counsels against extending Boyle beyond its holding, as the FTCA evidences no “clear and manifest purpose of Congress” to preempt state-law actions against contractors under the combatant activities exception. Id. at 1195. Although my colleagues perceive support for their own position in Wyeth — a decision in which the Court found that a federal statute did not preempt state tort claims — I do not see it.
It may be that congressional intent “is much clearer in the case of the statutory text of the combatant activities exception” than in “federal drug regulations.” Op. at 10. But the only intent that is clear in the former text is the intent to preserve sovereign immunity in suits against the United States. The FTCA says nothing at all about suits against “contractors” other than that contractors are not “federal agencies]” for purposes of the Act. 28 U.S.C. § 2671.
No other circuit court has gone as far as our circuit goes today. Koohi v. United States was, like Boyle, a products liability case. 976 F.2d 1328 (9th Cir.1992). There, the Ninth Circuit did apply the combatant activities exception to bar suit against the manufacturer of an air defense system deployed on a U.S. naval vessel that shot down an Iranian aircraft. As my colleagues recognize, however, the Ninth Circuit’s rationale was that tort liability is inappropriate where “force is directed as a result of authorized military action.” Op. at 7 (emphasis added) (quoting Koohi, 976 F.2d at 1337). Unlike the situation in Koohi, where sailors fired the weapon, there is no claim here that the force used against the plaintiffs was either “directed” or “authorized” by U.S. military personnel.
Nor are my colleagues assisted by the foreign policy cases they cite. Op. at 11-12. Those cases involved preemption of state laws that were specifically targeted at issues concerning the foreign relations of the United States, a description the court does not dispute.[8] Moreover, in virtually all of them, the preempted state *25 laws conflicted with express congressional or executive policy regarding the targeted issues. Although the court does dispute this description as to two of the cited cases, the description is accurate. In American Insurance Association v. Garamendi, the Supreme Court found a “clear conflict” between a California statute applying only to Holocaust-era insurance “policies issued by European companies, in Europe, to European residents,” and “express federal policy” contained in Executive Branch agreements with Germany, Austria, and France. 539 U.S. 396, 425-26, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). Similarly, in Crosby v. National Foreign Trade Council, the Court preempted a state statute that expressly purported to regulate foreign commerce with Burma in ways that “undermine[d] the intended purpose and ‘natural effect’ ” of a congressional sanctions regime aimed directly at Burma. 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).[9]
The cases before us, by contrast, involve the application of facially neutral state tort law. And there is no express congressional or executive policy with which such law conflicts. See infra Part II.C.[10] No prece *26 dent has employed a foreign policy analysis to preempt state law under such circumstances.[11]
My colleagues acknowledge that the “nature of the conflict” they perceive in these eases is “somewhat different from that in Boyle — a sharp example of discrete conflict in which satisfying both state and federal duties ... was impossible.” Op. at 7. “Rather,” they say, here “it is the imposition per se” of state tort law “that conflicts with the FTCA’s policy of eliminating tort concepts from the battlefield.” Id. (emphasis added). In short, the court’s decision to utilize the combatant activities exception requires it to shift from preemption based on conflict-of-duty to preemption based on conflict-of-policy. But even if this shift were justified, we would still have no basis for ruling that such a conflict of policy exists.
1. According to the court, “the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield,” and that policy is “equally implicated whether the alleged tortfeasor is a soldier or a contractor” under the circumstances at issue in these cases. Op. at 7. The court is plainly correct that the FTCA’s policy is to eliminate the U.S. government’s liability for battlefield torts. That, after all, is what the FTCA says. But it is not plain that the FTCA’s policy is to eliminate liability when the alleged tortfeasor is a contractor rather than a soldier. That, after all, is not what the FTCA says. See W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (declaring that “[t]he best evidence of [congressional] purpose is the statutory text”). Nor, as the court recognizes, is there any support for its position in the “singularly barren” legislative history of the combatant activities exception. Op. at 6-7 (quoting Johnson v. United States, 170 F.2d 767, 769 (9th Cir.1948)).
Congress knows full well how to make its intention to preclude private liability known. See, e.g., 22 U.S.C. § 2291-4(b) (providing that interdiction of an aircraft over foreign territory pursuant to a presidentially approved program “shall not give rise to any civil action ... against the United States or its employees or agents ” (emphasis added)). It has not done so here. Rather, as already discussed, Congress expressly excluded contractors from the definition of federal agencies that retained sovereign immunity under the exceptions to the Act. See 28 U.S.C. § 2671.
Indeed, because the FTCA concerns only the immunity of the United States, the FTCA itself does not even protect soldiers or other government employees from tort suits. That protection is afforded by the Westfall Act, which provides that, “[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment,” the federal employee is dismissed and “the United States shall be substituted as the party defendant.” 28 U.S.C. § 2679(d)(1). “Thereafter, the suit is governed by the FTCA and is subject to all of the FTCA’s exceptions” to the waiver *27 of sovereign immunity, including the combatant activities exception. Wuterich v. Murtha, 562 F.3d 375, 380 (D.C.Cir.2009); see 28 U.S.C. § 2679(d)(4).
But contractors are not covered by the Westfall Act either. In fact, because that Act uses the FTCA’s definitions, they are again expressly excluded from its protections. 28 U.S.C. § 2671. And yet, the court preempts this state tort action without requiring (or receiving) the Attorney General certification that would have been necessary had the defendants been government employees rather than private contractors. It thus grants private contractors more protection than our soldiers and other government employees receive. Such a congressional policy cannot be inferred from the language of the FTCA.
2. There is also no indication that the Executive Branch shares the court’s judgment that military contractors must be exempt from tort law. To the contrary, DOD has advised contractors that accompany the Armed Forces in the field that they are subject to civil liability, and it has rejected a request to extend Boyle to all combatant activities. Moreover, it has lent no support whatsoever to the defense of the contractors here.
In a rulemaking “to implement DOD policy regarding contractor personnel authorized to accompany U.S. Armed Forces deployed outside the United States,” the Department explicitly advised military contractors that “[ijnappropriate use of force could subject a contractor or its subcontractors or employees to prosecution or civil liability under the laws of the United States and the host nation.” Contractor Personnel Authorized to Accompany U.S. Armed Forces, 73 Fed.Reg. 16,764, 16,764, 16,767 (Mar. 31, 2008) (emphasis added) [hereinafter DFARS Rule]; see 48 C.F.R. § 252.225-7040(b)(3)(iii) (same).[12] When contractors expressed concern about the consequences of this advisory for their defenses in tort litigation, DOD made clear that it thought “the rule adequately allocates risks.” DFARS Rule, 73 Fed.Reg. at 16,768. And it specifically rejected a suggestion that it “invite courts” to expand the reach of Boyle by adopting “language that would immunize contractors from tort liability.” Id. The Department stated:
[T]he clause retains the current rule of law, holding contractors accountable for the negligent or willful actions of their employees, officers, and ‘ subcontractors. ... The public policy rationale behind Boyle does not apply when a performance-based statement of work is used in a services contract, because the Government does not, in fact, exercise specific control over the actions and decisions of the contractor or its employees or subcontractors.... Contractors will still be able to defend themselves when injuries to third parties are caused by the actions or decisions of the Government. However, to the extent that contractors are currently seeking to avoid accountability to third parties for their own actions by raising defenses based on the sovereignty of the United States, this rule should not send a signal that would invite courts to shift the risk of loss to innocent third parties.

Id.

[13]

Nor has the Executive Branch evinced any concern about the imposition of tort *28 liability in the cases now before us, notwithstanding the Army’s knowledge of the ongoing litigation.[14] My colleagues are nonetheless convinced that the failure to institute criminal proceedings against the contractors “indicates the government’s perception of the contract employees’ role in the Abu Ghraib scandal.” Op. at 10.[15] No such inference from prosecutorial silence is warranted. The government may well believe that it faces a jurisdictional barrier to prosecution, see supra note 3; it may lack the evidence that these plaintiffs have; it may feel that its evidence is insufficient to satisfy the higher burden of proof applicable to a criminal prosecution; or it may simply prefer to rely on the tort system. What we cannot conclude, however, is that the government doubts “the contract employees’ role in the Abu Ghraib scandal.” Op. at 10. See Report Of Maj. Gen. Fay at 130-34 (implicating two Titan and three CACI employees in wrongdoing at Abu Ghraib); id. at 84 (finding that “[t]he use of dogs in the manner directed by” a CACI employee “was clearly abusive and unauthorized”); id. at 133 (finding that a Titan employee “[ajctively participated in detainee abuse”).
The position DOD took in its rulemaking on contractor liability may reflect the government’s general view that permitting contractor liability will advance, not impede, U.S. foreign policy by demonstrating that “the United States is committed to ensuring that its contractors are subject to proper oversight and held accountable for their actions.” U.S. Dep’t of State, Press Release, Department of State Legal Adviser Promotes Accountability for Private Military and Security Companies (Sept. 17, 2008).[16] The government may have refrained from participating in the two cases now before us for the same reason. As President Bush stated, “the practices that took place in that prison are abhorrent and they don’t represent America.” White House, Press Release, President Bush Meets with AI Arabiya Television, 2004 WLNR 2540883 (May 5, 2004). Under these circumstances, the government’s failure to defend the contractors may reflect the Executive Branch’s view that the country’s interests are better served by demonstrating that “people will be held to account according to our laws.” White House, Press Release, Press Conference of the President, 2006 WLNR 10248633 (June 14, 2006). And the Executive may believe that one way to show that “people will be held to account” is to permit this country’s legal system to take its ordinary course and provide a remedy for those who were wrongfully injured.
None of this is to suggest that we can know with certainty the unexpressed policy views of Congress or the Executive, or to discount the reasonableness of the poli *29 cy concerns expressed by my colleagues. Quite the contrary. But the existence of plausible yet divergent assessments of the policy consequences of tort liability further counsels against judicial preemption. If Congress believes that such liability would hamper the war effort, it can amend the FTCA or the Westfall Act to protect private contractors. If the Executive is of that view, it can say so.
Under the rule adopted today, however, the court has removed an important tool from the Executive’s foreign policy toolbox. Even if the Executive believes that U.S. interests would be advanced by subjecting private contractors to tort liability under these circumstances, today’s decision makes it impossible to accomplish that end absent congressional action. That is a particularly ironic consequence of a rule that the court adopts based upon a quite proper concern that the Judiciary not interfere with the Executive’s flexibility in the area of foreign policy.
3. In addition to their argument that the imposition of tort liability on contractors constitutes a per se conflict with the policy of the political branches, my colleagues raise more specific policy conflicts they believe tort suits would engender. Op. at 7-8.
The court notes, for example, that “the costs of imposing tort liability on government contractors [will be] passed through to the American taxpayer, as was recognized in Boyle” Id. at 7. The Boyle Court did indeed recognize the risk of a monetary pass-through, but it did not respond by preempting all tort liability for government contractors. In fact, the Court thought that was “too broad” a response to the potential pass-through problem, Boyle, 487 U.S. at 510, 108 S.Ct. 2510, and instead barred recovery only where there was a direct conflict with a government-imposed duty, see id. at 512, 108 S.Ct. 2510.
My colleagues also express concern that, in the absence of preemption, U.S. military personnel will be haled into court or deposition proceedings involving private contractors. Op. at 7. But that concern does not require across-the-board preemption. Where discovery would hamper the military’s mission, district courts can and must delay it — until personnel return stateside, or until the end of the war if necessary.[17] Where production of witnesses or documents would damage national security regardless of timing, the usual privileges apply.[18] To deny preemption is not to grant plaintiffs free reign.[19]
*30 4. The court further suggests that the broad field preemption it prescribes is required to properly balance the federal and state interests at stake in this kind of litigation. In support of this contention, the court declares that the “federal government’s interest in preventing military policy from being subjected to fifty-one separate sovereigns ... is not only broad — it is also obvious.” Op. at 11. The point is indeed obvious, but also inapposite. As discussed above, there is nothing in the pleadings or record to suggest that the abuse alleged here was part of any “military policy.” Moreover, even if there were a jurisdiction whose tort law conflicted with military policy, Boyle itself would provide a narrower answer: selective preemption of “only particular elements” of the state’s law. Boyle, 487 U.S. at 508, 108 S.Ct. 2510 (citing United States v. Little Lake Misere Land Co., 412 U.S. 580, 595, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), for the proposition that, “assuming state law should generally govern federal land acquisitions, [the] particular state law at issue may not”).[20]
The court also expresses puzzlement over what interest any state could “have in extending its tort law onto a foreign battlefield.” Op. at 9. But there is no issue of “extending” a state’s law here; the case involves only the application of a state’s traditional, generally applicable tort law. That such law may apply to conduct in a foreign country is hardly unusual. Under the Foreign Sovereign Immunities Act, for example, state tort law typically provides a cause of action even for plaintiffs who sue foreign sovereigns, including for conduct that takes place abroad.[21]
This is not to deny that many states would indeed have little or no interest in this particular litigation. But it is not clear that Virginia and California,[22] the states in which CACI and Titan maintain their principal places of business, have no interest in ensuring that their corporations refrain from abusing prisoners-even in a foreign country. See Restatement (Second) of Conflict of Laws § 9 cmt. f (1971) (“[A] person is most closely related to the state of his domicile], and this state has jurisdiction to apply its local law to determine certain of his interests even when he *31 is outside its territory. It may, for example, ... forbid him to do certain things abroad.”).
More important, even if the court were correct that “the interests of any U.S. state ... are de minimis in this dispute” because “all alleged abuse occurred in Iraq against Iraqi citizens,” Op. at 12, today’s decision cuts a much wider swath. It would bar suit even if the victims of the contractors’ assaults were fellow Virginians or Californians — including fellow employees of the same contractors. See, e.g., Jones v. Halliburton Co., 625 F.Supp.2d 339 (S.D.Tex. May 9, 2008) (tort suit by a Texas woman alleging rape by fellow contractor employees in Iraq). Indeed, the decision would bar suit even if the victims were soldiers whom the contractors were hired to support. The rule the court has announced, then, is not truly one in which the “breadth of displacement” of state law is “inversely proportional to state interests.” Op. at 12. Rather, and notwithstanding its best intentions, the court has crafted a rule that overrides state interests altogether, regardless of their strength in a given case.
In any event, there are certainly ways short of broad preemption to ensure that a trial court neither asserts jurisdiction over a case that lacks a significant connection with the forum, nor applies the law of a state with no interest in the matter. The doctrine of forum non conveniens is one such tool.[23] So, too, are the limits that states impose on the extraterritorial reach of their own courts,[24] as well as limitations imposed by the Constitution’s Due Process Clause.[25] Indeed, if my colleagues are right about the state interests at stake here, it is possible that one of these doctrines could end these cases without resort to nontextual preemption.
Finally, even if the prospect of applying state laws in this kind of case would present an insurmountable conflict with federal interests, Boyle again counsels a different disposition from that which my colleagues adopt. As Boyle explained, “where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts [with] and is replaced by federal rules.” 487 U.S. at 507, 108 S.Ct. 2510 (emphasis added). Accordingly, where the Supreme Court finds field preemption appropriate, it does not normally preempt state law and simply leave the field vacant. Instead, it substitutes a federal common law regime.[26] That is what *32 the Court did in Clearfield Trust Co. v. United States, the case my colleagues cite as the archetypal example of “field preemption.” Op. at 6, 7; see 318 U.S. 363, 366-67, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (holding that the rights and obligations of the United States with respect to commercial paper must be governed by a uniform federal rule). It is also what my colleagues’ own analysis would dictate. See Op. at 7 (arguing that the government’s “interest in combat is always ‘precisely contrary’ to the imposition of a non-federal tort duty” (emphasis added)). Yet here, the court simply leaves the field.[27]
Ill
For the reasons just stated, the preemption question in these cases should be controlled by Boyle, which authorizes displacement of state law only when a federal contract imposes a directly conflicting duty on a contractor. Because there is no such conflict here — indeed, because the duties imposed are congruent rather than incompatible — there is no warrant for preemption.
Nonetheless, I cannot say that my colleagues’ arguments in favor of extending Boyle to the combatant activities exception lack weight. What I can say, in agreement with them, is that even if we do extend Boyle, “the ‘scope of displacement’ of the preempted non-federal substantive law must be carefully tailored so as to coincide with the bounds of the federal interest being protected.” Op. at 8 (quoting Boyle, 487 U.S. at 512, 108 S.Ct. 2510). Subpart III.A' sets out what the appropriate “scope of displacement” would be were we to rely upon the combatant activities exception, and then explains why these cases fall outside that scope. Subpart III.B discusses the problems posed by the essentially untailored test my colleagues apply instead.
A
The FTCA’s combatant activities exception preserves the United States’ sovereign immunity for “[a]ny claim arising out of the combatant activities of the military or naval forces ... during time of war.” 28 U.S.C. § 2680(j). According to the statutory text, that exception' — like the discretionary function exception, the other exceptions, and the FTCA as a whole — applies only in “civil actions ... against the United States” and only for injuries caused by an “employee of the Government.” Id. § 1346(b)(1). In light of the FTCA’s text, the Boyle Court crafted preemption conditions that would assure that the discretionary function in question “was considered by a Government officer, and not merely by the contractor itself.” 487 U.S. at 512, 108 S.Ct. 2510. If we are to extend Boyle to the combatant activities exception, we must demand the same assurance. Hence, for preemption to be appropriate, it must be for “claim[s] arising out of the combatant activities of the military or naval forces,” 28 U.S.C. § 2680© (emphasis added), and not for those arising out of acts performed “by the contractor itself,” Boyle, 487 U.S. at 512, 108 S.Ct. 2510.
How, then, can we tell whether a contractor’s conduct actually involved the *33 combatant activities of the military? In this respect, I agree with my colleagues that, at a minimum, the contractor must be “under the military’s control.” Op. at 7. I disagree, however, as to how to determine the existence of such control. In the military, control is achieved through the chain of command. And the official view of the U.S. Department of Defense is that private contractors accompanying the Armed Forces in the field are not in that chain.
The DOD’s position, as set out in its regulations governing “Contractors Accompanying the Force,” is that contractors are responsible for the supervision of their own employees and that their personnel are not in the military chain of command. The regulations state:
The commercial firm(s) providing battlefield support services will perform the necessary supervisory and management functions of their employees. Contractor employees are not under the direct supervision of military personnel in the chain of command.
U.S. Dep’t of the Army, Reg. 715-9, Contractors Accompanying the Force § 3 — 2(f) (1999). The regulations further state: “Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel.” Id. § 3 — 3(b). Titan’s contract with the Army is consistent with this position. See Titan Statement of Work § C-l.l (Titan J.A. 386) (“The Contractor shall provide all ... supervision, and other items and services ... necessary to provide foreign language interpretation and translation services in support of United States (U.S.) Forces.”).[28]
The Army Field Manual on “Contractors on the Battlefield” is, if anything, even more emphatic on these points:
Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government employees); only contractors manage, supervise, and give directions to their employees.
U.S. Dep’t of the Army, Field Manual 3-100.21, Contractors on the Battlefield § 1-22 (2003). As the Field Manual further explains:
It is important to understand that the terms and conditions of the contract establish the relationship between the military (U.S. Government) and the contractor; this relationship does not extend through the contractor supervisor to his employees. Only the contractor can directly supervise its employees. The military chain of command exercises management control through the contract.
Id. § 1-25; see also id. § 4-45 (“Maintaining discipline of contractor employees is the responsibility of the contractor’s management structure, not the military chain of command.... It is the contractor who must take direct responsibility and action for his employee’s conduct.”); Joint Chiefs of Staff, Joint Pub. 4-0, Doctrine for Logistic Support of Joint Operations, at V-8 (2000) (Titan J.A. 568) (stating that “[e]ontract employees are disciplined by the contractor” and that “[cjommanders have no penal authority to compel contractor personnel to perform their duties”).
In sum, under the existing regulatory regime, contractor personnel are not subject to the command and control of the *34 military. The responsibility for their supervision belongs to their civilian employers. “Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command.” Field Manual 3-100.21, § 1-22. And “[c]ontracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel.” Army Reg. 715-9, § 3-3(b). The government exercises control only “through the contract,” Field Manual 3-100.21, § 1-25, which gives the government no more control than any contracting party has over its counterparty. And that — without more — is not enough to make the conduct of a contractor “the combatant activities of the military or naval forces.” 28 U.S.C. § 2680© (emphasis added).
Of course, the fact that preemption is not warranted by application of the combatant activities exception does not mean that preemption is never warranted. If a plaintiff challenges contractor activity that has been authorized or directed by the military, preemption by application of the discretionary function exception may result — as it did in Boyle. There is no evidence in the record of these cases, however, that the brutality the plaintiffs allege was authorized or directed by the United States.
B
My colleagues reach a different disposition than I do under the combatant activities exception because they employ a different test for preemption. The test they adopt is as follows: “During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor’s engagement in such activities shall be preempted.” Op. at 9. But what does “integrated into” mean? How “integrated” into combatant activities must the contractor be? And what does “retains command authority” mean in light of the DOD regulations discussed above? My colleagues have created a vague and amorphous test and, in so doing, have invited precisely the kind of litigation they fear.
Today’s opinion further holds that “the district judge properly focused” not on “the contract terms,” but “on the chain of command and the degree of integration that, in fact, existed between the military and both contractors’ employees.” Op. at 4 (emphasis added). But why should that be the proper focus? Why should we ignore the military’s own description of its chain of command-as set forth in its contracts, regulations, and manuals — and instead investigate the facts on the ground? Does this not again invite the wide — ranging judicial inquiry — with affidavits, depositions, and conflicting testimony — that the court rightly abjures? The irony is again evident: we must have a robust contractor defense so as not to interfere with the Executive’s conduct of war; but in applying that defense, we do not take the military at its word and instead inquire into the actual operation of its chain of command.
None of these problems are apparent in today’s opinion, but that is only because the court does not apply its test to the facts of these cases. Instead, it simply states that “there is no dispute that [the contract employees] were in fact integrated and performing a common mission with the military under ultimate military command.” Op. at 6-7. But there is in fact considerable dispute over whether the contract employees were truly under the military’s command at Abu Ghraib. The plaintiffs made that point in this court,[29] *35 and they submitted substantial evidence of lack of military control in the district court.
For example, the plaintiffs submitted an affidavit from the Brigadier General in charge at Abu Ghraib, who declared: “The Titan translators and other corporate employees were not integrated into the military chain of command.... [Military officials could not give Titan translators and other corporate employees direct orders.” Decl. of Brig. Gen. Janis Karpinski ¶7 {Titan J.A. 725-26). Similarly, an affidavit from a Military Intelligence Specialist at the prison stated: “Titan translators ... did not act like soldiers, and my unit did not treat them like soldiers. They did not fall within the military chain of command .... [W]e had no means of disciplining Titan translators if they did not do what we requested.” Deck of Anthony Lagouranis ¶¶ 11-12 {Titan J.A. 733). Affidavits from Titan employees were in accord. A Titan Translator affirmed that: “I received assignments from soldiers, and tried to maintain a good relationship with them, but they could not give me orders. I was employed by Titan — and only Titan could fire me. I did not report to a military chain of command.” Deck of Marwan Mawiri ¶ 9 {Titan J.A. 519). And a Titan employee who supervised Titan translators in Iraq declared: “Only the Titan management had the power to supervise and discipline Titan translators.... The military could not fire or discipline a Titan employee.” Deck of Thomas Crowley ¶¶ 7-8 {Titan J.A. 515).
Needless to say, there was contrary evidence as well. But surely the plaintiffs’ testimonial affidavits, alone or in combination with DOD’s regulatory and contractual statements, are sufficient to create a genuine issue of material fact. And for that reason, the defendants are not entitled to judgment as a matter of law at the current stage of this litigation, even under my colleagues’ own test. See Fed.R.CivP. 56(c) (providing that summary judgment should be granted only if “there is no genuine issue as to any material fact”); see also Boyle, 487 U.S. at 514, 108 S.Ct. 2510 (holding that “whether the facts establish the conditions for the [preemption] defense is a question for the jury”). That the court does not reach this conclusion only confirms the breadth of the protective cloak it has cast over the activities of private contractors.[30]
IV
No congressional statute bars the plaintiffs’ state-law actions from running their ordinary course in these cases. Indeed, the only cited statute suggests the opposite. No statement of the Executive Branch declares that its interests require dismissal of these cases. Again, the only indications we have from the government are to the contrary. Nor is there any claim that “the state-imposed duty of care that is the asserted basis of the contractor[s’] liability ... is precisely contrary to the duty imposed by the Government contract,” Boyle, 487 U.S. at 509, 108 S.Ct. 2510, or even that the contractors came within the military’s view of its chain of command.
Because “[c]ourts should preempt state law only when the justification for preemption is fairly traceable to the foreign policy *36 choices not of the federal courts, but rather of the federal political branches,” Jack Goldsmith, Statutory Foreign Affairs Preemption, 2000 Sup.Ct. Rev. 175, 213, and because the political branches have not made such policy choices evident here, I respectfully dissent.

. Available at http://armed-services.senate. gov/statement/2004/May/Rumsfeld.pdf.

. See S. Res. 356, 108th Cong. (2004) ("condemnfing] in the strongest possible terms the despicable acts at Abu Ghraib prison”); H.R. Res. 627, 108th Cong. (2004) (declaring that the abuses at Abu Ghraib "are offensive to the principles and values of the American people and the United States military ... and contradict the policies, orders, and laws of the United States and the United States military and undermine the ability of the United States military to achieve its mission in Iraq”).

. For example, the court accepts Titan’s view that government investigations found that its employees were not involved in detainee abuse at Abu Ghraib. Op. at 2-3. But Titan is wrong. See Report of Maj. Gen. Fay at 133 (finding that a Titan employee ''[a]ctively participated in detainee abuse”); id. at 130-34 (referring two Titan and three CACI employees for possible prosecution); see also id. at 84 (finding that ‘‘[t]he use of dogs in the manner directed by” a CACI employee “was clearly abusive and unauthorized”). Moreover, there is no indication that the government investigators had before them the same evidence that these plaintiffs intend to present. The court also notes that the U.S. Army Claims Service has rejected one plaintiff's claim for compensation (that of Saleh himself), Op. at 2-3, but there is no hint that the Claims Service has ever considered the merits of the sixteen other plaintiffs’ cases. Finally, the court notes that, to date, the government has not criminally charged the contract employees. Op. at 2, 10. But this sheds little light on the merits of the plaintiffs’ claims, given the different burdens of proof applicable to civil and criminal proceedings, as well as the special jurisdictional problems potentially attendant to the latter. See Report of Maj. Gen. Fay at 49-50 (noting that, because CACI’s contract may have been with the Interior Department rather than DOD, its employees “may not be subject to the Military Extraterritorial Jurisdiction Act”).

. See Plaintiffs-Appellees’ Br. 45-46 ("The limited discovery permitted by the District Court to date, combined with the military investigations and testimony regarding Abu Ghraib, strongly suggests that the CACI employees actually were the ringleaders in the illegal abuse.... CACI failed to present any evidence whatsoever that the CACI employees were directed by the military, [or] received military authorization and approval, to abuse prisoners.”).

. See Ibrahim Compl. ¶ 29 (alleging that the defendants committed the acts "[d]espite ... clear expressions of United States policy, and despite the expectation that the Defendants would perform their contractual duties in accordance with United States and international law”); Saleh Compl. ¶ 108 (alleging that the United States intended the contractors to "conduct interrogations in accord with the relevant domestic and international laws”).

. A separate RICO statement, filed solely by the Saleh plaintiffs, also alleged a broader conspiracy, but the district court dismissed the RICO count and the Saleh plaintiffs have abandoned the allegation. See Plaintiffs-Appellees' Br. 46. The Ibrahim plaintiffs never made such an allegation. See id at 2.

. My colleagues appear to acknowledge that, if the contractors’ employees committed the acts alleged here, their conduct would violate U.S. law. See Op. at 2 (citing 18 U.S.C. § 2340A (torture); id. § 2441 (war crimes); id. § 3261 (certain criminal offenses committed by anyone "employed by or accompanying the Armed Forces outside the United States”)); see also, e.g., 18 U.S.C. § 113 (describing assaults within the compass of § 3261). The Army Field Manual requires contractors to “comply with all applicable U.S. and/or international laws.” U.S. Dep't of the Army. Field Manual 3-100.21, Contractors on the Battlefield § 1-39 (2003); see also Report of Maj. Gen. Fay at 12-13 (stating that “civilians who accompany or work with the U.S. Armed Forces” are "bound by Geneva Conventions”).

. Rather than dispute this, the court notes that it is “a black-letter principle of preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law.” Op. at 12 n. 8 (emphasis added). As long as the word "may” is emphasized, that principle is correct. But this does not call into question the fact that no precedent has employed a foreign policy analysis to preempt generally applicable state laws (not to mention the fact that there is also no "federal scheme” here). See Jack Goldsmith, Federal Courts, Foreign Affairs, and Federalism, 83 Va. L.Rev. 1617, 1711 (1997) (explaining *25 that foreign affairs preemption should be limited to, at most, state laws that purposely interfere with foreign policy, not state laws that "are facially neutral and were not designed with the purpose of influencing U.S. foreign relations”). The three additional Supreme Court cases that the court cites, Op. at 12 n. 8, are simply inapposite. None involved foreign policy and all three involved statutory provisions that expressly preempted state law. See Riegel v. Medtronic, Inc., 552 U.S. 312, 128 S.Ct. 999, 1007-8, 169 L.Ed.2d 892 (2008); Bates v. Dow Agrosciences LLC, 544 U.S. 431, 442-43, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 520-23, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion).

. See also Zschernig v. Miller, 389 U.S. 429, 432, 440, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (holding that an Oregon probate statute, which barred residents' inheritances from going to heirs in countries with confiscatory property laws, was being used to "withhold[ ] remittances to legatees residing in Communist countries” and thereby "intru[de] ... into the field of foreign affairs”); Hines v. Davidowitz, 312 U.S. 52, 67, 74, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (concluding that Pennsylvania's Alien Registration Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” in enacting "a single integrated and all-embracing system” in the federal Alien Registration Act). See generally Medellin v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 1371-72, 170 L.Ed.2d 190 (2008) (describing Garamendí as a mere foreign “claims-settlement case[] involv[ing] a narrow set of circumstances”); Garamendi, 539 U.S. at 417, 123 S.Ct. 2374 (describing Zschemig as involving a state law that "in practice had invited minute inquiries concerning the actual administration of foreign law and so was providing occasions for state judges to disparage certain foreign regimes” (internal citation and quotation marks omitted)). The remaining case cited by the court, Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), involved application of the Constitution’s Foreign Commerce Clause to state taxation of foreign commerce.

. In a footnote to this part of their argument, my colleagues list a miscellany of federal civil and criminal statutes relating to torture. Although they describe the list as "comprehensive,” Op. at 13 n. 9, that description is not Congress' characterization, but theirs. Nor is there any evidence that Congress affirmatively "declined to create a civil tort cause of action that plaintiffs could employ,” id. (emphasis added) — let alone that Congress intended these statutes to displace existing state or federal law. Indeed, the only evidence of the purpose of the principal civil statute the court cites, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, is that it was intended to "enhance the remedy already available” for torture victims under the ATS, S.Rep. No. 102-249, at 5 (1991); see H.R. Rep. No. 102-367, at 4 (1991), U.S.Code Cong. & Admin.News 1991, pp. 84, 86 (same). As for the federal criminal statutes, Congress has passed a myriad of such statutes *26 covering virtually every area of modem life, and no court has ever suggested that in so doing the legislature intended to preempt existing state laws. If anything, the cited statutes — all of which condemn torture — confirm that there is no conflict between state law and federal policy on that issue.

. Cf. Medellin, 128 S.Ct. at 1371-72 (refusing to preempt a "neutrally applicable state law[]” despite the President’s affirmative submission that United States foreign policy would be undermined); Garamendi, 539 U.S. at 425-26, 123 S.Ct. 2374 (preempting a California insurance statute, but distinguishing it from "a generally applicable 'blue sky’ law” because the California statute "effectively singles out only policies issued by European companies, in Europe, to European residents”).

. As there is no existing federal common law of torts that could impose civil liability, DOD's warning of civil liability under the laws of the United States can only be a reference to state tort law.

. The court states that "there is no indication” in the above-quoted statement that DOD “considered, much less ruled out, whether tort suits against service contractors working within the military chain of command should be preempted.” Op. at 10 (emphasis added). But as discussed below, DOD's position is *28 that contractors are not within the military chain of command. See infra Part III.A.

. Compare Garamendi, 539 U.S. at 411, 413, 123 S.Ct. 2374 (citing a letter from Deputy Secretary Eizenstat to California officials stating that the California statute threatened to derail U.S. negotiations with Germany, and the amicus brief of the United States in support of preemption); Crosby, 530 U.S. at 386, 120 S.Ct. 2288 (reasoning that “repeated representations by the Executive Branch ... demonstrate that the state Act stands in the way of Congress’s diplomatic objectives”); Boyle, 487 U.S. at 501-02, 108 S.Ct. 2510 (in which the United States appeared as amicus curiae in support of preemption); Hines, 312 U.S. at 56, 61 S.Ct. 399 (same).

. The court also states that no “disciplinary” or "contract proceedings” have been instituted. Op. at 10. There is, however, nothing in the record indicating whether such proceedings have been brought.

. Available at http: //geneva.usmission.gov/ Press2008/September/0917PrivateSecurity. html.

. See Watts v. SEC, 482 F.3d 501, 509 (D.C.Cir.2007) (noting that district courts have the tools, "in cases involving third-party subpoenas to government agencies or employees,” to "properly accommodate the government’s serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations” (internal quotation marks omitted)).

. See Watts, 482 F.3d at 508 (noting that Federal Rule of Civil Procedure 45 "requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden”); Ibrahim, 391 F.Supp.2d at 16 (declining "to dismiss otherwise valid claims at this early stage,” but suggesting that the court would dismiss if "[m]anageability problems” emerge, "especially if discovery collides with government claims to state secrecy”).

. The court further suggests that "allowance of these claims will potentially interfere with the federal government’s authority to punish and deter misconduct by its own contractors.” Op. at 8. The court does not say why punishment and civil liability cannot coexist, or indeed, why they do not complement each other. The prospect of material interference is hardly self-evident, as parallel government and private litigation is the norm in cases ranging from assault, to antitrust, to securities regulation. See, e.g., Wyeth, 129 S.Ct. at 1202 (noting that state law tort suits can complement federal enforcement by the FDA). In any event, the executive branch — which *30 presumably knows more about what would interfere with its prerogatives than we do— has taken the position that civil liability should be available against military contractors. See supra Part II.C.2.

. My colleagues repeatedly raise the specter that the district court might apply Iraqi tort law. See Op. at 6, 7, 10-11. But the plaintiffs reject Iraqi law as a basis for their claims, and the district court did not contemplate it. Plaintiffs-Appellees’ Br. 53-54. Nor is it a realistic possibility. As we explained in Sami v. United States, "prevailing conflicts [of law] principles ... permit application of an alternate substantive law when foreign law conflicts with a strong public policy of the forum.” 617 F.2d 755, 763 (D.C.Cir.1979) (footnote omitted). But even if that specter were more corporeal, it would at most warrant application of the selective preemption option mentioned above and discussed in Boyle, 487 U.S. at 508, 108 S.Ct. 2510, not the kind of field preemption adopted in today's ruling.

. See, e.g., Republic of Austria v. Altmann, 541 U.S. 677, 685 & n. 4, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46; Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); Kilburn v. Socialist People’s Libyan Arab Jamahiriya, 376 F.3d 1123, 1125, 1129 (D.C.Cir.2004).

. The Saleh plaintiffs originally filed their complaint in federal district court in Titan’s home jurisdiction of California, from which the case was transferred at CACI’s request. Saleh v. Titan Corp., 361 F.Supp.2d 1152, 1155 (S.D.Cal.2005). Our district court has not yet addressed the question of which state law should apply, having limited initial proceedings to the question of preemption.

. See, e.g., Torres v. S. Peru Copper Corp., 113 F.3d 540, 541 (5th Cir. 1997) (dismissing extraterritorial tort claims under forum non conveniens).

. See, e.g., Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 509-10 (D.C.Cir.2002) (noting the limits of the District of Columbia's long-arm statute).

. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (barring extraterritorial application of a state's substantive law unless the state has a “significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair”); see also Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (holding that, for in personam jurisdiction to be asserted over a nonresident corporate defendant, there must be " 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice' " (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945))).

. See, e.g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (displacing New York’s “act of state” rule because “the scope of the act of state doctrine must be determined according to federal law”); Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (holding that, because collective bargaining agreements require uniform interpretation, *32 federal law based on "the policy of our national labor laws” must substitute for state law).

. The court states that preemption of state law will not leave the plaintiffs "totally bereft of all remedies ... as they will still retain rights under the Foreign Claims Act.” Op. at 8. But plaintiffs have no "rights” under that Act, which merely authorizes designated officials to make (or not make) certain payments as a matter of their unreviewable discretion. 10 U.S.C. §§ 2734, 2735; see Collins v. United States, 67 F.3d 284, 286-89 (Fed.Cir.1995); Niedbala v. United States, 37 Fed.Cl. 43, 46, 50 (1996).

. Titan’s contract further states that “[p]ersonnel performing work under this contract shall remain employees of the Contractor and will not be considered employees of the Gov-eminent.” Id. § C-l.4.1 (Titan J.A. 387). CACI’s contract states that its employees “are considered non-combatants.” CACI Statement of Work V 20© (CACI J.A. 332).

. See, e.g., Plaintiffs-Appellants' Br. 25 ("A reasonable jury could certainly find that the [Titan] translators who conspired with CACI *35 employees to abuse Plaintiffs were not under the United States military's command or control.'').

. Because I conclude that we should permit the state-law claims to go forward at this stage, and because the plaintiffs do not contend that their Alien Tort Statute claims would provide them with different relief, see 28 U.S.C. § 1350, I do not address the latter.